UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

ALYSON POLAND,

    Plaintiff,

     v.                                                          Civil Action No.

UNITED PARCEL SERVICE, INC.,

    Defendant.

COMPLAINT
JURY TRIAL REQUESTED
INJUNCTIVE RELIEF REQUESTED

NOW COMES the Plaintiff, Alyson Poland ("Ms. Poland"), by and through undersigned counsel, and complains against the Defendant, United Parcel Service, Inc. ("UPS"), as follows:

JURISDICTION AND PARTIES

1.      This action arises under the Maine Human Rights Act ("MHRA"), 5 M.R.S. §§ 4551 *et seq.*; the Whistleblowers' Protection Act ("WPA"), 26 M.R.S. §§831 *et seq.*, as enforced through the MHRA; and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq.*

2.      Ms. Poland is a United States citizen residing in the City of Auburn, County of Androscoggin, State of Maine.

3.      UPS is incorporated in the State of New York, with physical headquarters located in the City of Atlanta, State of Georgia. UPS has a Customer Center in the City of Auburn, State of Maine.

4.      UPS had 50 or more employees for each working day in each of 20 or more calendar weeks in the same calendar year as when the alleged discrimination occurred.

1

5.      This Court has subject matter jurisdiction over Ms. Poland's federal and state claims pursuant to 28 U.S.C. §§ 1331, 1332, and 1367.

6.      On or about July 28, 2024, Ms. Poland filed a timely Complaint/Charge of Discrimination against UPS alleging unlawful sex discrimination, discrimination for obtaining an order of protection from abuse, retaliation for opposing sex discrimination and harassment, and whistleblower retaliation with the Maine Human Rights Commission ("MHRC") and the Equal Employment Opportunity Commission ("EEOC").

7.      On or about May 29, 2025, the MHRC issued a Notice of Right to Sue with respect to Ms. Poland's state law claims.

8.      On or about May 30, 2025, the EEOC issued a Notice of Right to Sue with respect to Ms. Poland's federal law claims.

9.      Ms. Poland has exhausted her administrative remedies with respect to all claims set forth in this Complaint requiring administrative exhaustion.

<u>JURY TRIAL REQUESTED</u>

10.     Ms. Poland requests a trial by jury for all claims and issues for which a jury is permitted.

<u>FACTUAL ALLEGATIONS</u>

11.     Ms. Poland is female.

12.     Ms. Poland first started working for UPS in June 2019 as a preloader. She qualified to be a driver in February 2020. She resigned in April 2021 shortly before her daughter was born.

13.     Ms. Poland came back to work for UPS in October 2022. She started out again as a preloader and became a driver at the end of August or the beginning of September 2023.

14.     Ms. Poland was on a 30-day probation period as a driver.

15.     Ms. Poland's final rate of pay was $23 per hour. She worked full time, 40-45 hours per week.

16.     Jonathan Poland is male.

17.     Mr. Poland is Ms. Poland's ex-spouse.

18.     Ms. Poland met Mr. Poland while they were both working at UPS in 2019.

19.     While they were dating, Mr. Poland threw Ms. Poland to the ground and she was bruised.

20.     In 2023, Mr. Poland started harassing and stalking Ms. Poland after she told Mr. Poland that she was divorcing him.

21.     On August 17, 2023, the Polands were still living together in a house they jointly owned. Ms. Poland had friends over to visit.

22.     Mr. Poland became jealous and threatened to take an axe to their car if Ms. Poland's friends did not leave, so her friends left.

23.     On the same evening, Mr. Poland turned off the service to Ms. Poland's cell phone and deflated a tire on her truck to prevent her from leaving.

24.     Ms. Poland used the SOS feature on her phone to call the police. When deputies arrived, Mr. Poland prevented Ms. Poland from leaving the house through the front door. Ms. Poland ran out the other door of the house and spoke with the deputies about what happened.

25.     Ms. Poland moved out of the couple's joint residence after the August 17 incident.

26.      Mr. Poland began tracking Ms. Poland through her cell phone. He changed her cell phone service to a Verizon children's account so that he could see her location.

27.    Mr. Poland also started putting tracking devices on and in Ms. Poland's personal truck to assert power and control over her by monitoring her movements.

28.    Mr. Poland sent Ms. Poland threatening text messages.

29.    Ms. Poland found tracking devices under the passenger seat of her truck on August 24, 2023, and August 27, 2023. The truck was jointly owned, and Mr. Poland had a spare key.

30.    Ms. Poland believes that Mr. Poland was on UPS property when he put tracking devices in her truck as that was the only time their vehicles were parked in the same area.

31.    There is proof that Mr. Poland put tracking devices in Ms. Poland's truck. These are quotes from an Incident Report written by Patrol Officer Isaac Labonte with the Auburn Police Department.

- *"Jonathan admitted that he had been placing trackers in Alyson's truck to monitor where she had been going. Jonathan stated that he had told Alyson about the tracker."*

- *"Jonathan again admitted to placing a location tracker in Alyson's vehicle and stated that if I needed to know where she was, he could track her location. Jonathan pulled his cell phone out and stated that he could go into an app and know exactly where Alyson was."*

32.    On September 29, 2023, Ms. Poland clocked in for her regular shift at UPS.

33.    Mr. Poland was not working that day, but they had arranged for him to meet Ms. Poland at work to exchange their daughter at the end of Ms. Poland's shift.

34.    Toward the end of Ms. Poland's shift, a co-worker named Jay Ashton pulled Ms. Poland aside to let her know that he had just seen Mr. Poland rummaging around under the passenger seat of her truck in the UPS parking lot.

35.    Ms. Poland went out to the parking lot intending to ask Mr. Poland to stop.

36.    There is proof that Mr. Poland was in Ms. Poland's truck as reported to her by Mr. Ashton. This is a quote from an Incident Report written by Patrol Officer Isaac Labonte with the Auburn Police Department.

- *"Jonathan stated that he went into Alyson's truck to look for the tax documents that he believed were in there."*

37.    When Ms. Poland got to the parking lot, Mr. Poland was parked right behind her truck.

38.    Ms. Poland noticed Mr. Ashton's car in a location that was visible to both vehicles. That led Ms. Poland to believe that Mr. Ashton was not lying, nor did he have any reason to lie about what he saw Mr. Poland doing.

39.    When Ms. Poland approached Mr. Poland in the parking lot, she noticed that he was not dressed in his UPS uniform and that his nails were painted black which was a red flag to Ms. Poland about his mental state as Mr. Poland never wore nail polish.

40.    Ms. Poland told Mr. Poland that another driver had seen him inside her truck and asked Mr. Poland what he was doing.

41.    Mr. Poland immediately started yelling and denied he was in Ms. Poland's truck. He accused Mr. Ashton of lying. Mr. Poland continued to escalate.

42.    Ms. Poland was also getting nervous, stressed, and heated. She realized that her encounter with Mr. Poland was going to take longer than a few minutes.

43.    Ms. Poland went back inside to clock out and get her things so she could deal with the situation and hopefully find the tracking device that Mr. Poland had put inside her truck.

44.    Although Ms. Poland was fearful of Mr. Poland, she did not go to a supervisor for help because she expected that a supervisor would just tell her to call the police.

45.     Mr. Poland is a convicted felon and repeatedly told Ms. Poland that if she called the police on him, he would go to jail. Ms. Poland wanted to avoid this because she needed Mr. Poland's help in caring for their daughter.

46.     When Ms. Poland came back outside, she tried again to get Mr. Poland to tell her what he had been doing inside her truck.

47.     Ms. Poland checked her truck for the device. She found her wallet on the floor of the truck and opened it. Her ID was missing.

48.     Ms. Poland asked Mr. Poland about her wallet and ID.

49.     He denied any involvement.

50.     This was typical of the mind games Mr. Poland frequently played on Ms. Poland.

51.     Mr. Poland had been physically aggressive toward Ms. Poland in the recent past.

52.     Mr. Poland had told her that he can switch into the "old Jonny" whenever he wanted to get people to do what he wants.

53.     Mr. Poland had recently threatened to take an axe to her friends' car if they did not leave and tried to prevent Ms. Poland from leaving the house.

54.     On September 29, 2023, Ms. Poland saw that Mr. Poland was escalating toward violence. He was screaming at her and kept moving aggressively towards her.

55.     Based on Mr. Poland's recent stalking of her, the previous assault in 2020, his recent threats and efforts to control her, and his aggressive behavior in the parking lot, Ms. Poland feared Mr. Poland.

56.     Ms. Poland reacted to Mr. Poland's escalating behavior by slapping him. She felt threatened and did not know what else to do in the moment to stop Mr. Poland's escalation.

57.     Ms. Poland's slap was successful in temporarily stopping Mr. Poland's escalation.

58.    A co-worker, Donna K, saw Mr. and Ms. Poland arguing in the parking lot and began yelling, "You don't need to be doing that in front of that little girl" (meaning, their 2½ year old daughter who was in the car with Mr. Poland). Mr. Poland yelled across the parking lot, "She just slapped me!"

59.    Mr. Poland grabbed their daughter and tried to put her in Ms. Poland's truck, but Ms. Poland had locked it.

60.    Mr. and Ms. Poland had a quick conversation about who would keep their daughter that night and Mr. Poland eventually said, "Well, you can figure it out yourself" and put their daughter in the bed of Ms. Poland's truck.

61.    Mr. Poland then got in his car and drove to the front of the building.

62.    Donna K. came over and asked if Ms. Poland was alright and hugged her. Ms. Poland told Donna K that she was okay and that Mr. Poland had been acting crazy for a while.

63.    Ms. Poland drove to the front of the building and found Mr. Poland locked in his car. He told Ms. Poland he was calling the police and was going to file a domestic abuse charge against her.

64.    Ms. Poland left work and went home.

65.    Upon information and belief, after Ms. Poland left, Mr. Poland entered the building and complained to co-workers and managers about Ms. Poland slapping him.

66.    At around 12:00pm, Ms. Poland got a call from the police informing her that Mr. Poland had filed a domestic abuse charge against her and that she needed to come down to the station to make a statement.

67.    Ms. Poland left immediately and went to the police station to speak with an officer. After recounting her side of the story and explaining what Mr. Poland had been doing to

her over the past month, the officer told Ms. Poland they were not going to pursue any charges against her. The officer said that Ms. Poland slapped Mr. Poland in self-defense and recommended that Ms. Poland go to the court right away to get a Protection from Abuse ("PFA") order against Mr. Poland.

68.    The officer wrote:

*"I believe that with the totality of the circumstances, including a previous assault in 2020, Jonathan's recent tracking of Alyson, and aggressive behavior, Jonathan placed Alyson in fear of an assault during their altercation on the morning of 9/29/2023. I recommend that this case be reviewed for the charge of Domestic Violence Stalking against Jonathan."*

69.    Ms. Poland went right to the courthouse after leaving the police station and was granted a PFA order.

70.    On September 30, 2023, Ms. Poland took the PFA order with her to work.

71.    Either before her shift or during break, Ms. Poland went and found the manager, Mike Simpson, in an upstairs office. Hannah Day and Paul Englehart were with Mr. Simpson, so Ms. Poland waited until they left to talk to Mr. Simpson about what happened the previous day.

72.    Ms. Poland showed Mr. Simpson the PFA order and they had a brief conversation about what happened. Ms. Poland told Mr. Simpson that the police concluded that she acted in self-defense when she slapped Mr. Poland. Ms. Poland asked Mr. Simpson if he wanted a copy of the PFA.

73.    Mr. Simpson took the PFA and looked through it and said he was all set.

74.    Mr. Simpson did not take a copy of the PFA.

75.    Mr. Simpson told Ms. Poland to make sure nothing like that happens again on UPS property.

76.     Mr. Simpson told Ms. Poland that issues between her and Mr. Poland needed to stay out of work. Ms. Poland agreed.

77.     That is the last Ms. Poland heard about the issue for over one month.

78.     Ms. Poland's reports to managers on September 30, 2023, were protected reports for purposes of the Whistleblowers' Protection Act ("WPA"), the Maine Human Rights Act ("MHRA"), and Title VII. Ms. Poland made those reports to shed light on Mr. Poland's unlawful harassment of her based on sex and unlawful retaliation against her and in hopes that her employer would address and eliminate these violations going forward.

79.     On October 18, 2023, while the PFA order was in effect, Ms. Poland was working as a UPS driver, doing deliveries.

80.     At approximately 4pm on Stevens Mill Road in Auburn, Ms. Poland pulled off to the right-hand side of the road to make a delivery on the left-hand side of that road. Ms. Poland pulled over to let traffic go by before stepping out of the truck.

81.     The first vehicle behind Ms. Poland was Mr. Poland in his green Subaru Outback. He drove by slowly and Ms. Poland was able to identify Mr. Poland and his vehicle by the stickers on his rear window.

82.     Mr. Poland had been at work earlier in the day, making deliveries in Yarmouth. Mr. Poland lives in Leeds. There was no reason for Mr. Poland to be driving on Stevens Mill Road in Auburn.

83.     Ms. Poland believed that Mr. Poland was stalking her.

84.     Ms. Poland believed that Mr. Poland used UPS's systems to find out where she was scheduled to make deliveries and then went to find her.

85.    Ms. Poland believed that Mr. Poland left work, went back to the shop, used one of the office computers to see her plotted deliveries, and then used that information to locate and follow her. The office computer screen was constantly left open so that anyone had access to it.

86.    Ms. Poland called UPS and Sabrina Lyons picked up the phone.

87.    Ms. Poland was very shaken up. Ms. Poland told Ms. Lyons what happened and asked if anyone in the office had told Mr. Poland the location of her route.

88.    Ms. Lyons was short with Ms. Poland and sternly said, "No one has told Mr. Poland where you were, none of us want to be involved in that situation."

89.    In other words, Ms. Poland reported to Ms. Lyons that (a) she was being harassed on the job, (b) by another UPS employee, (c) on the basis of sex and, (d) in violation of her protection from a PFA order, and (e) Ms. Lyons was indifferent to and annoyed by her reported concerns.

90.    Next, Ms. Poland called the police. They asked Ms. Poland to come to the station immediately to ensure her safety. Ms. Poland explained that she was on a 30-day trial period with UPS and did not want to slow down her deliveries which could jeopardize her job. They told Ms. Poland to come down to the station after work to make a statement.

91.    Ms. Poland called Mr. Simpson to briefly let him know about the stalking and that she had just finished her deliveries.

92.    Ms. Poland kept it brief, factual, and professional.

93.    Mr. Simpson did not seem concerned at all about the situation with Mr. Poland.

94.    Ms. Poland's reports to Ms. Lyons and Mr. Simpson were protected reports for purposes of the MWPA, MHRA, and Title VII. She made the report to shed light on the unlawful

actions of Mr. Poland and in hopes that her employer would address and eliminate these violations going forward.

95.     Ms. Poland finished her deliveries and went to do her pickups.

96.     As she finished her remaining deliveries and pickups, Ms. Poland received multiple messages from people telling her that Mr. Poland was threatening to kill himself. Ms. Poland tried to stay focused on her job so she could deal with the situation later when she got back to the shop.

97.     When Ms. Poland returned to the shop, an evening supervisor, Bruce Goodwin, approached her and seemed very distraught. He told Ms. Poland that Mr. Poland had just texted that he (Mr. Poland) was going to kill himself and was saying goodbye.

98.     Ms. Poland believes that Mr. Goodwin spoke to Mr. Simpson about the text and asked if he should report it to the police. Ms. Poland believes that Mr. Simpson told Mr. Goodwin, "Do what you have to do."

99.      Ms. Poland went down to the police station to report what happened. Another driver, Kevin Haskell, went with her for support.

100.     Ms. Poland and Mr. Haskell went inside the police station and Ms. Poland made a statement. The police told Ms. Poland they were going to arrest Mr. Poland and that they had a warrant.

101.     Ms. Poland and Mr. Haskell left the police station and went to Ms. Poland's truck.

102.      When Ms. Poland tried to start her truck, the engine would not turn over. She and Mr. Haskell popped the hood to check it. Mr. Haskell noticed that three fuses had been pulled out, which prevented the truck from starting.

103.     Ms. Poland knew immediately that Mr. Poland had removed the fuses.

104.    The police waited outside with Ms. Poland.

105.    The police reported to Ms. Poland that they had Mr. Poland on traffic cameras in the area circling the police station and that the police had a warrant in hand for Mr. Poland's arrest.

106.    Mr. Poland's brother brought new fuses for the truck and installed them, so Ms. Poland could go home.

107.    Mr. Poland's brother looked under her truck and found another tracking device that Mr. Poland had installed. A police officer was right there when the tracking device was located and took it in for evidence.

108.    There is proof that Mr. Poland put another tracking device in Ms. Poland's truck. These are quotes from an Incident Report written by Officer Steven Friedrich with the Auburn Police Department.

- *After a few minutes of searching, a Tracki tracking device was discovered under the vehicle on the muffler. I viewed that tracking device, which appeared to be operational at that time, and took it to be submitted as evidence. Alyson identified the tracker as the same type and brand of tracking device that Jonathan had used on her vehicle in the past.*

109.    The only time Mr. Poland could have put a tracking device on Ms. Poland's personal vehicle would have been in the UPS parking lot. That was the only place Ms. Poland went to every day and her PFA order allowed Mr. Poland to have "incidental contact [with her] at UPS ONLY".

110.    Mr. Poland was arrested that night, October 18, 2023, for stalking Ms. Poland and violating the PFA order.

111.    Ms. Poland believes that on October 23, 2023, Mr. Poland learned that she was dating another man.

112.    One day later, on October 24, 2023, Mr. Poland made a formal complaint to UPS about Ms. Poland slapping him in the parking lot on September 29, 2023.

113.    The formal complaint that Mr. Poland made on October 24, 2023, was made in bad faith in retaliation for Ms. Poland breaking up with him; her reports and opposition to UPS regarding Mr. Poland's ongoing stalking and harassment; and her obtaining a PFA order.

114.    When Mr. Poland reported Ms. Poland's slap he omitted relevant and important information and context including his history of assault, threats, and stalking that led up to the incident; his yelling, stalking and threatening on September 29, 2023 that led Ms. Poland to slap him in self-defense; the fact that the police did not charge Ms. Poland for the slap but rather concluded that she acted in self defense and instead recommended that Mr. Poland be charged with Domestic Violence Stalking; or the fact that Mr. Poland was subsequently charged with Domestic Violence Stalking, Violating Protection from Abuse Order, Burglary of a Motor Vehicle and Criminal Mischief and pled guilty to Domestic Violence Stalking and Violating Protection from Abuse Order.

115.    Mr. Poland presented some information while omitting other information to create the false impression that Ms. Poland had acted in a malicious and inappropriate manner and that Ms. Poland had assaulted him when that was not the case.

116.    Mr. Poland reported the incident on October 24, 2023 and reported it in an inaccurate and misleading way in order to get Ms. Poland in trouble at UPS and preferably to get her terminated.

117.    UPS supervisors had previously been informed that Ms. Poland slapped Mr. Poland, and they responded by telling Ms. Poland not to do it again. Ms. Poland did not do

anything else to Mr. Poland to justify him making another complaint, this time through formal channels.

118.    UPS management had already learned about the incident, responded to the incident, and limited their action to telling Ms. Poland not to do it again.

119.    On November 1, 2023, Ms. Poland reported to the UPS Human Resources line that Mr. Poland had harassed and stalked her at the UPS facility while she was driving for UPS.

120.    Ms. Poland's report to the UPS Human Resources line was a protected report for purposes of the MWPA, MHRA, and Title VII. She made the report to shed light on the unlawful actions of Mr. Poland and in hopes that UPS would address and eliminate these violations going forward.

121.    Ms. Poland had previously reported the harassment and stalking to Mr. Simpson and Ms. Lyons.

122.    On November 2, 2023, Ms. Poland went to work and met with an investigator, Melissa Gloddy, Mr. Simpson, a woman who was taking notes, and her union steward Matt Blais.

123.    Ms. Poland was asked many questions about slapping Mr. Poland in the parking lot.

124.    Ms. Poland was asked only a handful of questions about her (Ms. Poland's) complaint that Mr. Poland harassed and stalked her at work.

125.    Ms. Gloddy asked for the dates when Ms. Poland suspected that Mr. Poland put trackers on her truck on UPS property. When Ms. Poland gave her the dates, she said, "Our cameras don't go back that far".

126.     Ms. Poland was told there was not much they could do about her complaint against Mr. Poland because they had no proof that Mr. Poland put trackers on her truck and no proof that he was stalking her.

127.     Ms. Poland disagreed and told them that she had a police report where Mr. Poland admitted that he put trackers on her vehicle and stalked her.

128.     Ms. Poland showed Ms. Gloddy the PFA and the police report.

129.     Ms. Gloddy quickly looked at the PFA but said she did not want to see the police report.

130.     Ms. Poland was told that Mr. Poland had denied putting trackers on her truck on UPS property and said there was not much that they could do about her complaint.

131.     The failure of Ms. Gloddy and the other managers in the meeting to look at the PFA, look at the police report, or listen and consider the facts provided by Ms. Poland was glaring and reflected that UPS had no interest in investigating the matter.

132.     Ms. Gloddy and the other managers knew that with very limited effort they could obtain relevant, reliable evidence that would exonerate Ms. Poland but intentionally failed to make this effort.

133.     UPS was, at best, negligent with regard to its failure to investigate.

134.     If UPS had engaged in a good faith investigation of the September 29, 2023 incident it would have uncovered evidence which undercut Mr. Poland's misleading and inaccurate characterization of the matter including the PFA, the police reports, and the criminal charges against Mr. Poland for his behavior before, during, and after Ms. Poland acted in self defense on September 29, 2023.

135.    Ms. Poland's reports to managers on November 2, 2023, were protected reports for purposes of the MWPA, MHRA, and Title VII. She made these reports to shed light on the unlawful actions of Mr. Poland and in hopes that UPS would address and eliminate these violations going forward.

136.    Ms. Poland left the meeting and went to her work truck and was getting ready to leave to make her deliveries.  Mr. Blais came outside and told Ms. Poland that UPS was terminating her employment for workplace violence because she admitted to slapping Mr. Poland on September 29, 2023.

137.    Mr. Poland was not disciplined or fired for harassing Ms. Poland on the basis of sex and in violation of a PFA order by tampering with Ms. Poland's vehicle in the UPS parking lot, using UPS systems to find out where she was making deliveries, stalking Ms. Poland while she made deliveries for UPS, and otherwise harassing Ms. Poland and violating the PFA.

138.    UPS professes that it is committed to providing a workplace free from all forms of unlawful discrimination, harassment, and retaliation.

139.    UPS professed to be committed to a safe work environment that is free of threats, intimidation, and physical harm. When Ms. Poland (female) defended herself from a man's threats and aggressive behavior by slapping Mr. Poland, UPS quickly and easily determined that Ms. Poland violated its workplace violence policy.

140.    However, when Ms. Poland (female) reported to UPS that Mr. Poland (male) was harassing her because of sex (she was divorcing him), stalking her while she was working in the community, attempting to control her by putting tracking devices in her vehicle, and violating her PFA order, UPS took no corrective action. This is clear evidence that UPS applied a double standard based on sex. Ms. Poland, a female who defended herself from sexual harassment, was

fired. Mr. Poland, a male who previously assaulted Ms. Poland, who recently threatened Ms. Poland's friends, who was tracking Ms. Poland's vehicle and her cell phone, and who put Ms. Poland in fear of another assault while in a UPS parking lot, was treated as an innocent victim.

141.    UPS violated Ms. Poland's right to be free from a hostile work environment based on sex by failing to investigate and take corrective action to address ongoing, severe, and pervasive harassment of Ms. Poland by Mr. Poland.

142.    Ms. Poland engaged in protected activity when she exercised her rights under the MHRA, WPA, and Title VII, by reporting and opposing sexual harassment and hostile work environment.

143.    UPS managers and HR retaliated against Ms. Poland for reporting and opposing sex harassment and the hostile work environment based on sex caused by Mr. Poland's harassment in violation of the MHRA, Title VII, and the WPA.

144.    UPS managers and HR retaliated against Ms. Poland for reporting and opposing working conditions that endangered her safety and violated the law in violation of the WPA.

145.    UPS managers and HR retaliated against Ms. Poland because she sought and obtained a PFA order to protect herself from Mr. Poland in violation of the MHRA.

146.    Mr. Poland was married to Ms. Poland because he is male and she is female. Mr. Poland was angered and upset that Ms. Poland wanted to end her relationship with him and was motivated to retaliate against her for ending the relationship and having relationships with people other than him, her reports and opposition to UPS regarding Mr. Poland's ongoing stalking and harassment; and her obtaining a PFA order.

147.    Mr. Poland was motivated by this unlawful retaliatory animus to make an inaccurate, misleading, bad faith report to UPS in order to get Ms. Poland terminated.

148.    Mr.  Poland's October 24, 2023 report proximately caused Ms. Poland's termination.

149.    This is clear from the fact that UPS managers were previously aware of the September 29, 2023 incident and did not terminate Ms. Poland but rather just told her not to do it again. This changed when Mr. Poland made his formal complaint which quickly led to Ms. Poland's termination.

150.    UPS acted on Mr. Poland's retaliatory and discriminatory animus and effectuated his unlawful plan to get Ms. Poland terminated.

151.    UPS was, at the very least, negligent in its failure to investigate Mr. Poland's bad faith allegations against Ms. Poland.

152.    If UPS had appropriately investigated the matter then the evidence would have made it clear that Mr. Poland's report was inaccurate, misleading, and made in bad faith and Ms. Poland would not have been terminated.

153.    UPS is liable for the unlawful termination of Ms. Poland because it, through its negligence, permitted Mr. Poland to effectuate his retaliatory and discriminatory plan to get Ms. Poland terminated.

154.    Mr. Poland's subordinate bias was a motivating factor in Ms. Poland's termination.

155.    UPS's liability on these grounds is highlighted in *Velazquez-Perez v. Devs. Diversified Realty Corp.*, 753 F.3d 265, 274 (1st Cir. 2014):

> In short, an employer can be held liable under Title VII if: the plaintiff's co-worker makes statements maligning the plaintiff, for discriminatory reasons and with the intent to cause the plaintiff's firing; the co-worker's discriminatory acts proximately cause the plaintiff to be fired; and the employer acts negligently by allowing the co-worker's acts to achieve their desired effect though it knows (or

reasonably should know) of the discriminatory motivation. Here, a reasonable jury applying this test could find in favor of Velázquez.

156.    In the midst of Mr. Poland's unlawful threatening and stalking of Ms. Poland at and around the workplace, UPS managers expressed annoyance and indifference.  This unfortunate attitude towards the crimes that were occurring in front of them resulted in UPS becoming complicit in Mr. Poland's campaign to harm Ms. Poland.

157.    UPS's unlawful discrimination and retaliation are evidenced by the fact that UPS has dissembled the facts and provided pretextual explanations for its adverse actions.

158.    UPS's unlawful discrimination and retaliation are evidenced by probative timing.

159.    UPS's unlawful discrimination and retaliation are evidenced by the discriminatory and retaliatory animus of Ms. Poland's coworker, Mr. Poland, and UPS managers.

160.    Ms. Poland's sex, protected reports opposing harassment and discrimination, and obtaining a PFA against her coworker were motivating factors in the decision to terminate her employment.

161.    In addition to causing Ms. Poland economic damages, Defendant's discrimination and retaliation has caused Ms. Poland substantial stress, anxiety, and humiliation and other non-economic damages.

162.    Defendant knowingly violated Plaintiff's state and federal rights and/or violations Plaintiff's rights with reckless indifference and so are liable for punitive damages.

<u>COUNT I: MHRA – Sex Discrimination – Disparate Treatment</u>

163.    Paragraphs 1-162 are incorporated by reference.

164.    Defendant has engaged in unlawful sex discrimination.

<u>COUNT II: MHRA – Sex Harassment</u>

165.    Paragraphs 1-164 are incorporated by reference.

166.    Defendant is liable for harassment based on sex by failing to investigate and take corrective action when Plaintiff reported that she was being subjected to a hostile work environment based on sex.

### COUNT III: MHRA – PFA Discrimination

167.    Paragraphs 1-166 are incorporated by reference.

168.    Defendant has engaged in unlawful discrimination against Plaintiff for exercising her right to obtain a Protection from Abuse order.

### COUNT IV: MHRA – Retaliation

169.    Paragraphs 1-168 are incorporated by reference.

170.    Defendant's conduct violated the MHRA's prohibition against unlawful retaliation under the MHRA.

### COUNT V: WPA Retaliation

171.    Paragraphs 1-170 are incorporated by reference.

172.    Defendant's conduct violated the WPA's prohibition against discharging an employee because the employee engaged in protected activity under the WPA, as enforced through the MHRA.

### COUNT VI: Title VII – Sex Discrimination

173.    Paragraphs 1-172 are incorporated by reference.

174.    Defendant has engaged in unlawful sex discrimination.

### COUNT VI: Title VII – Sex Harassment

175.    Paragraphs 1-174 are incorporated by reference.

176.    Defendant is liable for harassment based on sex by failing to investigate and take corrective action when Plaintiff reported that she was being subjected to a hostile work environment based on sex.

<u>COUNT VIII: Title VII – Retaliation</u>

177.    Paragraphs 1-176 are incorporated by reference.

178.    Defendant's conduct violated Title VII's prohibition against retaliation.

<u>PRAYER FOR RELIEF</u>

Plaintiff respectfully requests that the Court grant the following relief:

A.    Declare the conduct engaged in by Defendant to be in violation of her rights;

B.    Enjoin Defendant, its agents, successors, employees, and those acting in concert with it from continuing to violate her rights;

C.    Order Defendant to reinstate Plaintiff or award front pay to Plaintiff;

D.    Order Defendant to pay for Plaintiff's educational expenses;

E.    Award lost future earnings to compensate Plaintiff for the diminution in expected earnings caused by Defendant's discrimination;

F.    Award equitable-relief for back pay, benefits and prejudgment interest;

G.    Award compensatory damages in an amount to be determined at trial;

H.    Award punitive damages in an amount to be determined at trial;

I.    Award nominal damages;

J.    Award attorney's fees, including legal expenses, and costs;

K.    Award prejudgment interest;

L.      Permanently enjoin Defendant from engaging in any employment practices which discriminate on the basis of sex, receipt of a PFA, and protected activity under the MHRA, Title VII, and the WPA;

M.      Require Defendant to mail a letter to all employees notifying them of the verdict against them and stating that Defendant will not tolerate discrimination in the future;

N.      Require that Defendant post a notice in all of its workplaces of the verdict and a copy of the Court's order for injunctive relief;

O.      Require that Defendant train all management level employees on the protections afforded by the MHRA, WPA, and Title VII;

P.      Require that Defendant place a document in Plaintiff's personnel file which explains that Defendant unlawfully terminated her because of unlawful discrimination and retaliation; and

Q.      Grant to Plaintiff such other and further relief as may be just and proper.


Dated: July 7, 2025                              /s/ *Chad T. Hansen*
                                                 Chad T. Hansen
                                                 Attorney for the Plaintiff

                                                 EMPLOYEE RIGHTS GROUP
                                                 92 Exchange Street 2nd floor
                                                 Portland, Maine 04101
                                                 Tel. (207) 874-0905
                                                 Fax (207) 874-0343
                                                 Chad@EmployeeRightsLaw.Attorney