UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| ALYSON POLAND, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:25-cv-00347-JAW |
| | ) | |
| UNITED PARCEL SERVICE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON UPS' MOTION TO DISMISS**

This employment discrimination action arises from United Parcel Service, Inc.'s (UPS) termination of Alyson Poland after she reported that her then-husband and UPS coworker had stalked and harassed her. Ms. Poland asserts eight claims against UPS under the Maine Human Rights Act (MHRA), Maine Whistleblowers' Protection Act (MWPA), and Title VII, and UPS moves to dismiss each claim. Concluding that Ms. Poland has plausibly alleged claims for discrimination based on her seeking to obtain a protection from abuse order and retaliation under the MHRA, MWPA, and Title VII but has not plausibly alleged claims for sex discrimination or sex harassment, the court grants in part and denies in part UPS's motion to dismiss.

## I. INTRODUCTION

### A. Procedural History

On July 28, 2024, Alyson Poland filed a charge of discrimination with the Maine Human Rights Commission (MHRC) and the Equal Employment Opportunity Commission (EEOC), alleging sex discrimination, discrimination for obtaining a Protection from Abuse (PFA) order, retaliation for opposing sex discrimination, and

harassment, and whistleblower retaliation. *First Am. Compl.* (ECF No. 14) ¶ 6. The MHRC and EEOC issued Notices of Right to Sue on May 29, 2025 and May 30, 2025, respectively. *Id* ¶¶ 7-8. On July 7, 2025, Ms. Poland filed a complaint against UPS, asserting claims under the MHRA, the MWPA, and Title VII. *Compl.* (ECF No. 1). On September 5, 2025, UPS moved to dismiss. *Def.'s Mot. to Dismiss* (ECF No. 9) (*Def.'s Mot.*).

On October 17, 2025, Ms. Poland filed her First Amended Complaint. *First Am. Compl.* (ECF No. 14).[1] The First Amended Complaint asserts eight counts: Count One, sex discrimination, disparate treatment under the MHRA; Count Two, sex harassment under the MHRA; Count Three, discrimination for exercising the right to obtain a PFA order under the MHRA; Count Four, retaliation under the MHRA; Count Five, retaliation under the MWPA, as enforced through the MHRA; Count Six, sex discrimination under Title VII; Count Seven, sex harassment under Title VII; and Count Eight, retaliation under Title VII. *First Am. Compl.* ¶¶ 166-181. On November 7, 2025, Ms. Poland filed her opposition to UPS's motion to dismiss. *Pl.'s Opp'n to Def.'s Mot. to Dismiss* (ECF No. 23) (*Pl.'s Opp'n*). On November 21, 2025, UPS filed its reply. *Def.'s Reply* (ECF No. 24).

### B. The Factual Allegations in the First Amended Complaint[2]

[1] On October 27, 2025, after Ms. Poland filed an amended complaint, the Court issued an order, requiring UPS to notify the Court as to whether it was going to persist with the already filed motion to dismiss. *Order* (ECF No. 15). On November 3, 2026, UPS indicated that it intended to proceed with its motion to dismiss against the recently filed First Amended Complaint. *Def.'s Notice Regarding Mot to Dismiss* (ECF No. 17).

[2] On a motion to dismiss pursuant to Rule 12(b)(6), the factual allegations in the complaint are accepted as true, and the Court draws "all reasonable inferences in favor of the plaintiff." *Trans-Spec Truck Serv., Inc. v. Caterpillar, Inc.*, 524 F.3d 315, 320 (1st Cir. 2008)).

Ms. Poland alleges that she was subjected to stalking and harassment by her then-husband and UPS coworker, Jonathan Poland, during the breakdown of their marriage, that the conduct extended into the workplace, and that UPS failed to address her complaints before ultimately terminating her employment. *First Am. Compl.* ¶¶ 11-165.

### 1. Ms. Poland's Employment at UPS and Relationship with Mr. Poland

Ms. Poland first began working for UPS in June 2019 as a preloader and qualified as a driver in February 2020. *Id.* ¶ 12. She resigned in April 2021 and returned to UPS in October 2022, becoming a driver again in approximately August or September 2023. *Id.* ¶¶ 12-13. Ms. Poland met Jonathan Poland while they were both working at UPS in 2019, and the two later married. *Id.* ¶¶ 16-20.

While they were dating, Mr. Poland "threw Ms. Poland to the ground and she was bruised." *Id.* ¶ 19. After she told him in 2023 that she intended to divorce him, he began harassing and stalking her. *Id.* ¶ 20. Among other things, Mr. Poland placed tracking devices in her truck to monitor her movements. *Id.* ¶¶ 26-31. According to a police incident report, Mr. Poland "admitted that he had been placing trackers in Alyson's truck to monitor where she had been going." *Id.* ¶ 31.

### 2. September 29, 2023: The UPS Parking-Lot Incident and PFA Order

On September 29, 2023, while Ms. Poland was on shift at UPS, a coworker told her that he had seen Mr. Poland rummaging inside her personal truck in the UPS parking lot. *Id.* ¶¶ 32-34. Ms. Poland alleges that when she confronted Mr. Poland,

he began yelling, denied entering the truck, and became increasingly aggressive. *Id.* ¶¶ 39-43. Ms. Poland did not call the police because Mr. Poland is a convicted felon and had repeatedly told her that "if she called the police on him, he would go to jail." *Id.* ¶¶ 44-45. Ms. Poland wanted to avoid this because she needed Mr. Poland's help caring for their daughter. *Id.* ¶ 45. Ms. Poland saw that Mr. Poland was "escalating toward violence," screaming at her, and kept moving aggressively towards her. *Id.* ¶ 54. Fearing Mr. Poland based on his conduct that day and his prior threats, stalking, and physical aggression, she slapped him. *Id.* ¶¶ 51-57.

Mr. Poland reported the slap to police. *Id.* ¶ 65. Around 12:00 p.m., Ms. Poland received a call from the police informing her that Mr. Poland had filed a domestic abuse charge against her and that she needed to come down to the station to make a statement. *Id.* ¶ 66. After speaking with Ms. Poland at the station, however, the investigating officer declined to pursue charges against her concluding that she had acted in self-defense. *Id.* ¶ 67. The officer instead wrote that, based on "the totality of the circumstances," including Mr. Poland's alleged "previous assault," "recent tracking of Alyson," and "aggressive behavior," Mr. Poland had "placed Alyson in fear of an assault" and recommended that the matter "be reviewed for the charge of Domestic Violence Stalking against Jonathan." *Id.* ¶ 68. Ms. Poland then obtained a Protection from Abuse ("PFA") order against Mr. Poland. *Id.* ¶ 69.

The next day, Ms. Poland informed UPS manager Mike Simpson about the incident, showed him the PFA order, and told him that police had concluded that she acted in self-defense. *Id.* ¶¶ 70-72. Mr. Simpson allegedly declined a copy of the PFA

and told Ms. Poland to ensure that nothing similar happened again on UPS property and that issues between her and Mr. Poland needed to remain outside of work. *Id.* ¶¶ 72-77. Ms. Poland's reports to managers were intended to "shed light on Mr. Poland's unlawful harassment of her based on sex and unlawful retaliation against her and in hopes that her employer would address and eliminate these violations going forward." *Id.* ¶ 78.

### 3. October 2023: Alleged Continued Stalking and Harassment

Mr. Poland's conduct continued while the PFA remained in effect. On October 18, 2023, while making UPS deliveries on Stevens Mill Road in Auburn, Ms. Poland saw Mr. Poland drive slowly past her in his vehicle. *Id.* ¶¶ 79-81. Because Mr. Poland had been making deliveries in Yarmouth earlier that day and lived in Leeds, Ms. Poland believed he had used a UPS office computer displaying her scheduled deliveries to locate and follow her. *Id.* ¶¶ 82-85. She called UPS and told Sabrina Lyons what had happened and asked whether anyone in the office had given Mr. Poland the location of her route. *Id.* ¶¶ 86-87. Ms. Lyons responded, "No one has told Mr. Poland where you were, none of us want to be involved in that situation." *Id.* ¶ 88. Ms. Poland called the police, who asked her "to come to the station immediately to ensure her safety." *Id.* ¶ 90. Ms. Poland explained that she was in a thirty-day trial period as a UPS driver and did not want to interrupt her deliveries and risk jeopardizing her job, so the police instructed her to come to the station after work. *Id.*

When she returned to the UPS facility, an evening supervisor told her that Mr. Poland had texted him that he was going to kill himself and was saying goodbye. *Id.* ¶ 97. Ms. Poland went to the police station and made a statement. *Id.* ¶¶ 99-100. Later that day, another tracking device was discovered underneath Ms. Poland's personal vehicle, and police arrested Mr. Poland for stalking Ms. Poland and violating the PFA order. *Id.* ¶¶ 102-110. On October 24, 2023, Mr. Poland made a formal complaint to UPS concerning the September 29 parking lot incident. *Id.* ¶ 112. Ms. Poland alleges that Mr. Poland's complaint omitted the circumstances preceding the slap, including his alleged stalking and threatening behavior, the police determination that Ms. Poland had acted in self-defense, and the criminal charges against him. *Id.* ¶¶ 113-117.

#### 4. November 2023: UPS's Investigation and Ms. Poland's Termination

On November 1, 2023, Ms. Poland reported to UPS's Human Resources line that Mr. Poland had stalked and harassed her at the UPS facility and while she was making deliveries. *Id.* ¶¶ 119-120. The following day, Ms. Poland met with a UPS investigator, Mr. Simpson, another UPS representative, and her union steward, Matt Blais. *Id.* ¶ 122. According to Ms. Poland, UPS questioned her extensively about slapping Mr. Poland but asked only a handful of questions about her allegations that Mr. Poland had stalked and harassed her. *Id.* ¶¶ 123-124. Ms. Poland showed UPS the PFA and offered a police report documenting Mr. Poland's alleged conduct, but the investigator declined to review the police report. *Id.* ¶¶ 128-129. UPS took no corrective action against Mr. Poland in response to her reports that he had stalked

and harassed her, tracked her vehicle, and violated the PFA. *Id.* ¶¶ 125-140. After the meeting, Ms. Poland returned to her work truck to prepare for her deliveries, at which point Mr. Blais informed her that UPS was terminating her employment for workplace violence because she had admitted to slapping Mr. Poland on September 29, 2023. *Id.* ¶ 136.

### C. The Parties' Positions

#### 1. UPS' Motion to Dismiss

##### a. Counts Two and Seven: Hostile Work Environment Under the MHRA and Title VII

UPS argues that Ms. Poland's hostile work environment claims under the MHRA and Title VII fail because she has not plausibly alleged that Mr. Poland harassed her "because of sex." *Def.'s Mot.* at 6. According to UPS, the allegations instead describe harassment arising from the deterioration of Ms. Poland's personal relationship with Mr. Poland. *Id.* at 6-7. UPS further contends that Ms. Poland has not alleged a basis for holding UPS liable for Mr. Poland's conduct because he was her coworker, not her supervisor, and UPS took reasonable action once Ms. Poland complained. *Id.* at 8-10.

##### b. Counts One and Six: Sex Discrimination Under the MHRA and Title VII

UPS next argues that Ms. Poland has not plausibly alleged that UPS terminated her because of her sex. *Id.* at 10. UPS maintains that Mr. Poland is not a suitable comparator because Ms. Poland admittedly slapped him on UPS property, while she does not allege that UPS knew he had engaged in comparable workplace

violence. *Id.* at 11-13. UPS also disputes Ms. Poland's subordinate-bias theory, arguing that the allegations do not support a reasonable inference either that Mr. Poland acted with sex-based animus in making his complaint or that UPS negligently permitted any such animus to cause Ms. Poland's termination. *Id.* at 11-12. In UPS's view, any alleged inadequacy in its investigation does not itself support an inference that UPS terminated Ms. Poland because of her sex. *Id.*

### c. Counts Three, Four, Five, and Eight: PFA Discrimination and Retaliation Under the MHRA, MWPA, and Title VII

UPS addresses Ms. Poland's PFA discrimination and retaliation claims together, relying on overlapping arguments as to causation. *See Def.'s Mot.* at 11-15. UPS argues that Ms. Poland has not plausibly alleged either that she was terminated because she obtained a PFA order or that UPS retaliated against her for protected activity. *Id.* As to the retaliation claims under the MHRA and Title VII, UPS acknowledges that Ms. Poland need only have had a reasonable, good-faith belief that she was opposing unlawful discrimination or harassment. *Id.* at 14-15. It contends, however, that the allegations do not support an inference that Ms. Poland believed she was complaining about conduct occurring because of her sex, rather than conduct arising from her divorce. *Id.* at 15.

As to causation, UPS emphasizes that Ms. Poland was terminated for workplace violence immediately after admitting during its investigation that she had slapped Mr. Poland in the UPS parking lot. *Id.* at 13. UPS further points to Ms. Poland's allegation that Mr. Poland's October 24, 2023 complaint "proximately

caused" her termination, arguing that she alleges no facts permitting an inference that UPS acted on that complaint because she had obtained a PFA order or because of her earlier complaints. *Id.* at 13-14. UPS also contends that her supervisors' earlier knowledge of the slap does not suggest that UPS had "formally accepted or condoned" her conduct because she does not allege that those supervisors received Mr. Poland's formal complaint, had authority to terminate her, or made the termination decision. *Id.* at 14.

Finally, UPS rejects Ms. Poland's attempt to attribute retaliatory animus to Mr. Poland, arguing that she "does not even allege that Mr. Poland was aware of any complaint [she] had made to UPS." *Id.* UPS notes that Mr. Poland made his formal complaint on October 24, before Ms. Poland's November 1 complaint to Human Resources, and thus "could not have know[n] about this future event when he made his complaint to UPS." *Id.* at 14 & n.14.

#### d. Section 301 Preemption of the State Law Claims

Finally, UPS argues that § 301 of Labor Management Relations Act (LMRA), 29 U.S.C. § 185, preempts Ms. Poland's state-law claims because resolving those claims would require interpretation of the collective bargaining agreement (CBA) governing her employment. *Def.'s Mot.* at 15-19. UPS acknowledges that § 301 does not preempt a claim merely because it involves the same facts as a potential CBA claim or requires reference to the CBA but contends that preemption applies when resolution of a state-law claim is "substantially dependent" on interpretation of the agreement. *Id.* at 15-17. UPS argues that Ms. Poland's claims meet that standard

because they challenge the adequacy of UPS's investigation and its decision to terminate her for workplace violence while allegedly failing to discipline Mr. Poland for his conduct. *Id.* at 18-19. According to UPS, evaluating those theories would require the Court to interpret the CBA provisions governing discipline and termination to determine whether UPS properly and consistently applied those procedures to Ms. Poland and Mr. Poland. *Id.* UPS therefore contends that Ms. Poland's state-law claims are substantially dependent on interpretation of the CBA and are preempted by § 301. *Id.* at 19.

**2. Ms. Poland's Opposition**

Ms. Poland responds that the First Amended Complaint states plausible claims and that UPS's motion applies too demanding a pleading standard. *Pl.'s Opp'n* at 1-2. She emphasizes that a plaintiff need not plead facts establishing every element of a prima facie case to survive a motion to dismiss, although she maintains that her allegations satisfy the prima facie requirements in any event. *Id.*

**a. Counts Two and Seven: Hostile Work Environment Under the MHRA and Title VII**

Ms. Poland responds that the First Amended Complaint alleges "severe and pervasive harassment" based on sex. *Id.* at 3-5. She argues that in its motion, UPS improperly disregards allegations of "physical assault, threats of violence, intimidation, and threatening" conduct outside the workplace, which she contends "provide context and bolster the pervasiveness and severity of the harassment that continued into the workplace." *Id.* at 3. She further argues that treating Mr. Poland's conduct as arising from their failed relationship rather than her sex "establishes a

false dichotomy." *Id.* at 4 (quoting *Forrest v. Brinker Int'l Payroll Co.*, 511 F.3d 225, 229 (1st Cir. 2007)). Ms. Poland further contends that the alleged conduct was sufficiently severe and pervasive because it involved physical threats and stalking at the UPS facility and while she was performing her delivery route and ultimately resulted in criminal charges against Mr. Poland. *Id.* at 5. Ms. Poland also disputes that UPS took prompt remedial action, arguing that after she reported the September 29 incident and PFA order, UPS "took no action" to address Mr. Poland's alleged harassment, which thereafter continued while she worked. *Id.* at 5-6.

**b. Counts One and Six: Sex Discrimination Under the MHRA and Title VII**

Ms. Poland argues that the First Amended Complaint plausibly alleges that UPS terminated her because of sex. *Pl.'s Opp'n* at 7-11. She first contends that she satisfies the prima facie case, whose causation burden is "relatively light" and requires only "a small showing that is not onerous and is easily made." *Id.* at 7 (quoting *Brady v. Cumberland Cnty.*, 2015 ME 143, ¶ 14, 126 A.3d 1145, 1150-51).

Ms. Poland also advances a sex-stereotyping theory, pointing to allegations that UPS managers blamed her for Mr. Poland's conduct, characterized it as "drama," and expressed annoyance at her reports. *Id.* at 7-9. Comparing those allegations to EEOC guidance concerning stereotypes about victims of domestic violence, she argues that UPS acted on a "sex-based perception of victims of gender-based violence." *Id.* at 8.

Ms. Poland maintains Mr. Poland is a comparator. *Id.* at 9-10. She argues that both were UPS drivers, but that UPS terminated her for slapping him in self-

defense while he was "not even disciplined" for alleged stalking, tracking, and harassment. *Id.* She maintains that "similarity, rather than identicality," is the relevant comparator standard. *Id.* at 10 (quoting *Ripoli v. Dep't of Hum. Servs.*, 123 F.4th 565, 578 (1st Cir. 2024)).

Finally, Ms. Poland argues that UPS's termination was pretextual, noting that she disclosed the September 29 slap to Mr. Simpson the next day and was not disciplined, but UPS "changed course" more than a month later and terminated her for the same conduct. *Id.* at 11.

**c. Counts Three, Four, Five, and Eight: PFA Discrimination and Retaliation Under the MHRA, MWPA, and Title VII**

Ms. Poland argues that her PFA discrimination and retaliation claims are adequately pleaded. *Id.* at 11-17. As to PFA discrimination, she contends that the sequence of events plausibly supports an inference that her PFA contributed to UPS's decision to terminate her. *Id.* at 11-12. As to retaliation under the MHRA and Title VII, she argues that protected activity requires only a "good faith, reasonable belief" that the reported conduct violated those statutes. *Id.* at 12 (quoting *Fantini*, 557 F.3d at 32). As to the MWPA, she identifies her reports of domestic-violence stalking and PFA violations as protected reports of suspected violations of Maine law. *Id.* at 11 n.4, 12.

Ms. Poland identifies several bases for causation. First, she relies on "probative timing": UPS knew about the September 29 slap for more than a month without disciplining her but terminated her after she reported Mr. Poland's stalking

on October 18, November 1, and November 2. *Id.* at 12-14. She emphasizes that UPS acted only after these "three protected reports, including one on the day before she was fired." *Id.* at 14. Second, she argues pretext, asserting that UPS's reliance on conduct disclosed a month earlier was "weak and implausible." *Id.*

Third, Ms. Poland invokes *Velázquez-Pérez v. Developers Diversified Realty Corp.*, 753 F.3d 265, 274 (1st Cir. 2014), arguing that Mr. Poland's October 24 complaint was "prompted by retaliatory animus" because it followed by less than a week her reports to UPS and the police. *Id.* at 15. She further contends that Mr. Poland omitted material information from his complaint and that UPS negligently allowed his alleged retaliatory motive to cause her termination by failing to review the police report or further investigate before firing her. *Id.* at 16-17.

#### d. Section 301 Preemption of the State-Law Claims

Finally, Ms. Poland argues that § 301 does not preempt her state-law claims merely because her employment was governed by a CBA. *Id.* at 17-19. She argues that her MHRA and MWPA claims concern "state law rights" independent of the CBA and turn on whether she was subjected to a hostile work environment or treated "differently and worse because of her sex and protected activity," without requiring interpretation of the CBA. *Id.* at 18. With respect to the MWPA, Ms. Poland notes that Maine repealed 26 M.R.S. § 837 in 2021 and argues that earlier cases relying on that provision to preempt MWPA claims are "no longer good law." *Id.* at 18 n.6.

### 3. UPS's Reply

#### a. Counts Two and Seven: Hostile Work Environment Under the MHRA and Title VII

In reply, UPS argues that Mr. Poland's conduct arose from "personal animosity related to their acrimonious, ongoing divorce," rather than Ms. Poland's sex. *Def.'s Reply* at 2 (citing *Am. Bd. of Internal Med. v. Salas Rushford*, 114 F.4th 42, 59 (1st Cir. 2024)). UPS acknowledges that outside-of-work conduct may bear on a harasser's motive but argues that Ms. Poland identifies no facts showing that Mr. Poland's conduct was motivated by her sex rather than their "prior failed relationship." *Id.* at 2-3.

**b. Counts One and Six: Sex Discrimination Under the MHRA and Title VII**

UPS reiterates that Ms. Poland has not plausibly alleged that she was terminated because of her sex. *Id.* at 3-5. It argues that her prima facie allegations are a "formulaic recitation of the elements" and that the "drama" language underlying her sex-stereotyping theory comes from the EEOC hypothetical, not either complaint. *Id.* at 3-4 & n.5. UPS also argues that Mr. Poland is not a comparator because Ms. Poland does not allege that he struck a coworker on UPS property without discipline or that UPS treated a male employee who engaged in "the same workplace conduct" more favorably. *Id.* at 5.

**c. Count Three and Counts Four, Five, and Eight: PFA Discrimination and Retaliation**

As to Ms. Poland's PFA discrimination and retaliation claims, UPS reiterates that she has not plausibly alleged protected activity or causation. *Id.* at 5-6. It contends that Ms. Poland does not allege that she believed she was reporting sex-based harassment and that no allegations suggest she was terminated for showing

UPS her PFA rather than because Mr. Poland subsequently reported the workplace incident to Human Resources. *Id.* UPS also rejects Ms. Poland's subordinate-bias theory, noting that UPS interviewed her and was "already aware of the police report and PFA at the time of her termination." *Id.* at 6. UPS argues that she does not identify "what additional context UPS would have discovered through additional investigation, or why it would have changed the outcome." *Id.*

**d. Preemption of the State-Law Claims**

Finally, UPS reiterates that resolving her disparate-treatment and negligent-investigation theories would require interpreting the CBA to determine who had authority to terminate employees, the circumstances permitting termination, the relative severity of different misconduct, and what investigation was required. *Id.*

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) requires dismissal of a complaint that "fail[s] to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). To state a claim, a complaint must contain, at minimum, "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). In other words, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Plausible means "'something more

than merely possible' or 'merely consistent with a defendant's liability.'" *Germanowski v. Harris*, 854 F.3d 68, 71-72 (1st Cir. 2017) (internal citation omitted) (first quoting *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012); and then quoting *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 11 (1st Cir. 2011)). Evaluating the plausibility of a claim is a "'context-specific' job that compels [judges] 'to draw on' [their] 'judicial experience and common sense.'" *Schatz*, 669 F.3d at 55 (quoting *Iqbal*, 556 U.S. at 679).

This is a "two-step analysis." *Cardigan Mountain Sch. v. N.H. Ins. Co.*, 787 F.3d 82, 84 (1st Cir. 2015). "First, the court must distinguish 'the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited).'" *García-Catalán v. United States*, 734 F.3d 100,t 103 (1st Cir. 2013) (quoting *Morales-Cruz v. University of Puerto Rico*, 676 F.3d 220, 224 (1st Cir. 2012)); *see also Schatz*, 669 F.3d at 55 (stating that a court may "isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements"). "Second, the court must determine whether the factual allegations are sufficient to support 'the reasonable inference that the defendant is liable for the misconduct alleged.'" *García-Catalán*, 734 F.3d at 103 (quoting *Haley v. City of Boston*, 657 F.3d 39, 46 (1st Cir. 2011)) The court "must assume the truth of all well-plead[ed] facts and give the plaintiff the benefit of all reasonable inferences therefrom." *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)).

## III. DISCUSSION

The Court first addresses whether § 301 of the LMRA preempts Ms. Poland's state law claims. It then considers, in turn, her claims for sex harassment, sex discrimination, PFA discrimination, retaliation under the MHRA and Title VII, and retaliation under the MWPA.

### A. Section 301 of the LMRA Does Not Preempt Ms. Poland's State Law Claims

Section 301 does not preempt Ms. Poland's state law claims because their resolution does not require the Court to interpret the CBA. Section 301 of the LMRA requires federal law to govern claims whose resolution is "substantially dependent upon analysis of the terms" of a collective bargaining agreement. *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 220 (1985). But "not every dispute concerning employment, or tangentially involving a provision of a collective-bargaining agreement," is preempted. *Id.* at 211. State laws establishing substantive rights and obligations independent of a labor contract remain enforceable so long as adjudicating those rights does not require interpretation of the CBA. *See Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 407, 412-13 (1988) ("As long as the state-law claim can be resolved without interpreting the collective-bargaining agreement itself, the claim is 'independent' of the agreement for § 301 pre-emption purposes").

The relevant distinction is between interpreting the CBA and merely consulting it. *See Lydon v. Bos. Sand & Gravel Co.*, 175 F.3d 6, 10 (1st Cir. 1999) ("Mere parallelism between a state law claim and a federal contract claim does not necessarily require state court interpretation of the CBA" and "the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation

plainly does not require the claim to be extinguished" (quotation omitted)); *see also Livadas v. Bradshaw*, 512 U.S. 107, 124 (1994) ("[W]hen the meaning of contract terms is not subject to dispute, the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished").

Conversely, § 301 preempts a claim that depends on determining the meaning of the CBA. *See Haggins v. Verizon New England, Inc.*, 648 F.3d 50, 55 (1st Cir. 2011) ("[Section] 301 preempts a state-law claim when 'the asserted state-law claim plausibly can be said to depend upon the meaning of one or more provisions within the collective bargaining agreement'") (quoting *Flibotte v. Pa. Truck Lines, Inc.*, 131 F.3d 21, 26 (1st Cir. 1997)); *Rueli v. Baystate Health, Inc.*, 835 F.3d 53, 63-65 (1st Cir. 2016) ("[W]e must consider whether plaintiffs' Weekly Wage Act claim plausibly would require interpretation of the CBA. We conclude that it would"); *Rose v. RTN Fed. Credit Union*, 1 F.4th 56, 62-64 (1st Cir. 2021) (claims "substantially depend[ed] on construing the terms" of the CBA because the employee's eligibility for compensation "may well depend upon how [the CBA's temporary transfer] provision is interpreted"). Even where the same facts bear on both a state law claim and a contractual dispute, § 301 does not preempt the state law claim if it can be resolved without interpreting the agreement.

UPS argues that Ms. Poland's state-law claims are preempted because, "[i]n essence," she asserts that UPS "improperly (or inconsistently) applied the CBA procedures which govern separation of a Teamster's employment." *Def.'s Mot.* at 18.

UPS argues that "any of Plaintiff's theories would require the Court to interpret the CBA to determine whether it was applied consistently or inconsistently" and, more specifically, whether "UPS applied the CBA differently to Plaintiff than to a male employee, or an employee who did not file complaints about a co-worker, or to Plaintiff as opposed to Mr. Poland." *Id.* at 18-19. Ms. Poland responds that resolution of her state-law claims "will turn on an application of the law to facts regarding the extent that Plaintiff was subjected to a hostile work environment and the extent to which Plaintiff was treated differently and worse because of her sex and protected activity." *Pl.'s Opp'n* at 18. The Court agrees with Ms. Poland.

*Lingle* provides the starting point. There, the employee was "covered by a collective-bargaining agreement that provide[d] her with a contractual remedy for discharge without just cause" but separately sought a "state-law remedy for retaliatory discharge." *Lingle*, 486 U.S. at 401. The Court explained that, "even if dispute resolution pursuant to a collective-bargaining agreement, on the one hand, and state law, on the other, would require addressing precisely the same set of facts," the state-law claim remains "'independent' of the agreement for § 301 pre-emption purposes" so long as it "can be resolved without interpreting the agreement itself." *Id.* at 409-10.

The same distinction applies here. Although UPS characterizes Ms. Poland's theory as asserting that it "improperly (or inconsistently) applied the CBA procedures," *Def.'s Mot.* at 18, Ms. Poland does not allege that UPS violated the CBA by terminating her or that the CBA entitled her to different discipline. She instead

argues that she "was treated differently and worse because of her sex and protected activity." *Pl.'s Opp'n* at 18. Whether the CBA permitted UPS to terminate Ms. Poland for workplace violence therefore does not resolve whether UPS exercised that authority for a reason prohibited by Maine law. *See Lingle*, 486 U.S. at 412-13 ("[E]ven if an arbitrator should conclude that the contract does not prohibit a particular discriminatory or retaliatory discharge, that conclusion might or might not be consistent with a proper interpretation of state law.").

UPS's comparator argument does not require a different result. UPS contends that determining whether Ms. Poland "was treated differently and worse because of her sex" would require establishing "who had authority to terminate her and any alleged comparator," "under what circumstances the CBA allows termination," and "the relative severity of different misconduct for purposes of discipline under the CBA." *Def.'s Reply* at 7. UPS further argues that because Ms. Poland contends it should have terminated Mr. Poland, the Court would "necessarily" have to "analyz[e] whether the CBA would permit that result." *Id.* Ms. Poland, however, relies on UPS's allegedly different treatment of the two employees as evidence that she "was treated differently and worse because of her sex and protected activity," not as proof that the CBA required a particular disciplinary result. *Pl.'s Opp'n* at 18. *Lingle* makes clear that factual overlap with a contractual inquiry does not itself require preemption. *See Lingle*, 486 U.S. at 409-10 ("[E]ven if dispute resolution pursuant to a collective-bargaining agreement, on the one hand, and state law, on the other, would require

addressing precisely the same set of facts," the state-law claim remains independent if it "can be resolved without interpreting the agreement itself").

*LaRosa v. United Parcel Service, Inc.*, 23 F. Supp. 2d 136 (D. Mass. 1998), is instructive. There, UPS argued that its "legitimate, nondiscriminatory reason for the job action" was a CBA provision "permit[ting] immediate termination of an employee for dishonesty" and that resolution of the discrimination claim therefore "necessarily involve[d] an interpretation of the collective bargaining agreement." *Id.* at 147. The court rejected the argument, explaining that "[a]t best," the inquiry required it "to refer to the collective bargaining agreement to determine that the actual provision is present." *Id.* As *LaRosa* explained, "[t]he fact that" the contractual and discrimination claims "require consideration of the same set of facts does not mean that the state-law claims are dependent on the collective bargaining agreement." *Id.* at 148.

UPS's argument concerning its investigation similarly does not require interpretation of the CBA. Ms. Poland argues that "[i]f Defendant had reviewed the documents and engaged in some additional cursory investigation and analysis, they would not have fired Plaintiff." *Pl.'s Opp'n* at 17. UPS responds that this theory requires determining "what investigation is due under her CBA." *Def.'s Reply* at 7. But Ms. Poland does not assert that the CBA entitled her to a particular investigation; she relies on the investigation as evidence supporting her statutory claims. Determining what information UPS considered and whether its handling of that information bears on its motive presents the sort of "purely factual questions"

concerning "the conduct and motivation of the employer" that *Lingle* held did not require interpretation of a CBA. *Lingle*, 486 U.S. at 407.

Nor does *Allis-Chalmers* support preemption here. There, the state-law bad-faith claim concerned "the manner in which [the insurer] handled [the employee's] disability claim," and the employee's "right to disability benefits" arose from a disability-benefit plan incorporated into the CBA. *Allis-Chalmers*, 471 U.S. at 213. The duties underlying the state-law claim therefore "derive[d] from the rights and obligations established by the contract." *Id.* at 217. Here, Ms. Poland does not identify a CBA-created investigative or disciplinary right as the basis for her claims; she asserts rights under Maine's discrimination and retaliation statutes. *See Pl.'s Opp'n* at 17-18.

UPS's reliance on *Webb v. Calais Regional Hospital*, No. 1:18-cv-00117-LEW, 2019 U.S. Dist. LEXIS 113266 (D. Me. July 9, 2019), to support preemption of Ms. Poland's MWPA claim is likewise distinguishable. *See Def.'s Mot.* at 17. *Webb* relied on former 26 M.R.S. § 837,[3] which provided that the MWPA could "not be construed to diminish or impair rights arising under a collective bargaining agreement." *Id.* at *6 (quoting *Bishop v. Bell Atl. Corp.*, 81 F. Supp. 2s 84, 88 (D. Me 1999) (quoting 26 M.R.S. § 837); *see Nadeau v. Twin Rivers Paper Co.*, 2021 ME 16, ¶ 27, 247 A.3d 717. In *Nadeau*, the plaintiff alleged that his employer "violated the CBA" by "requir[ing] him to choose between signing the LCA and being terminated" and by relying on older

[3] In 2022, the Maine Legislature repealed 26 M.R.S. § 837. *See An Act to Amend the Whistleblowers' Protection Act to Ensure Coverage in Unionized Workplaces*, 2021 Me. HP 1399, L.D. 1889, Pub. L. 2022, c. 589 (Apr. 12, 2022).

discipline "despite the fact that discipline older than two years was not to be considered" under the CBA. *Id.* ¶ 36. The Maine Law Court concluded that because the MWPA claim "relie[d] on what [the plaintiff] claim[ed] [were] Twin Rivers' violations of the CBA," adjudication "would require a determination of whether Twin Rivers did, in fact, violate the CBA," which "would in turn require an in-depth interpretation of at least the work rule and discipline provisions of the CBA." *Id.* ¶ 38. Ms. Poland's MWPA claim does not similarly depend on establishing a violation of the CBA. She alleges that UPS terminated her because she engaged in activity protected by the MWPA, not that UPS violated the CBA in disciplining her. *See Pl.'s Opp'n* at 17-18.

Moreover, the Maine Legislature has since repealed section 837. *See An Act to Amend the Whistleblowers' Protection Act to Ensure Coverage in Unionized Workplaces,* ch.589, L.D. 1889, (Me. 2022). The title of the bill suggests that the Maine Legislature intended the bill to allow unionized employees to bring MWPA claims against their employers without being prevented from doing so by Maine law. The legislative history confirms that understanding. The summary accompanying L.D. 1889 explained in full:

> This bill changes the Whistleblowers' Protection Act in order to clarify its scope. The bill repeals a section of the Whistleblowers' Protection Act that was interpreted by the Maine Supreme Judicial Court in *Nadeau v. Twin Rivers Paper Company, LLC*, 2021 ME 16, 247 A.3d 717 as a bar to enforcement of the Act in many cases in which a collective bargaining agreement is in place.

L.D. 1889 , summary, 130th Leg., 2d Reg. Sess. (Me 2022).[4]

In any event, to the extent *Webb* and *Nadeau* relied on section 837 to conclude that a unionized employee may not proceed with a MWPA claim, the repeal of section 837 places their continued vitality as precedent in some doubt.

In sum, in the Court's view, adjudicating her MWPA claim does not require the Court to determine whether UPS complied with the CBA. The Court therefore concludes that resolution of Ms. Poland's state-law claims does not require interpretation of the CBA and that § 301 does not preempt Counts One through Five.

**B. Counts Two and Seven: Ms. Poland's Sex Harassment Claims**

Ms. Poland alleges sex harassment under both the MHRA, Count Two, and Title VII, Count Seven. *First Am. Compl.* ¶¶ 169, 179. Because "Maine courts apply the MHRA in accordance with federal anti-discrimination law *Forrest*, 511 F.3d at 228 n.1, the Court considers Ms. Poland's MHRA and Title VII sex harassment claims together. To establish a hostile work environment claim, a plaintiff must show: (1)

[4] The submitted testimony of Representative Thom Harnett, the bill's sponsor, the Executive Director and Commission Counsel of the Maine Human Rights Commission, and labor and employment practitioners is consistent with the view that the Maine Legislature repealed section 837 to effectively overturn the Maine Supreme Judicial Court's interpretation of the statute in *Nadeau*. *See An Act to Amend the Whistleblowers' Protection Act to Ensure Coverage in Unionized Workplaces: Hearing on L.D. 1889 Before the Joint Standing Comm. on Labor & Hous.*, 130th Legis. 1 (2022) (testimony of Rep. Thom Harnett) (explaining that *Nadeau* "resulted in unionized employees in Maine losing coverage under the Whistleblowers Protection Act" and that L.D. 1889 was "intended to address this decision"); *An Act to Amend the Whistleblowers' Protection Act to Ensure Coverage in Unionized Workplaces: Hearing on L.D. 1889 Before the Joint Standing Comm. on Labor & Hous.*, 130th Legis. 1, 5 (2022) (testimony of Amy M. Sneirson, Executive Director, & Barbara Archer Hirsch, Commission Counsel, Me. Hum. Rts. Comm'n) (explaining that *Nadeau* resulted in "most WPA claims by union employees" being "preempted by federal law" and urging repeal because *Nadeau* left unionized employees with "at best limited protections—and at worst, no protections—under the WPA due to the presence of § 837"); *An Act to Amend the Whistleblowers' Protection Act to Ensure Coverage in Unionized Workplaces: Hearing on L.D. 1889 Before the Joint Standing Comm. on Labor & Hous.*, 130th Legis. 3 (2022) (testimony of Jeffrey Neil Young, Vice President, Me. Emp. Laws. Ass'n) (stating that "the only way to restore union members' rights under the WPA is to repeal Section 837 altogether")

membership in a protected class; (2) unwelcome sexual harassment; (3) that the harassment was based on sex; (4) that the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment; (5) that the conduct was both objectively and subjectively offensive; and (6) a basis for employer liability. *Crowley v. L.L. Bean, Inc.*, 303 F.3d 387, 395 (1st Cir. 2002). UPS does not separately challenge the first, second, fourth, or fifth elements, focusing instead on whether the alleged harassment was based on sex and whether there is a basis for employer liability. *See Def.'s Mot.* at 7-10; *Def.'s Reply* at 2-3.

**1. Harassment Because of Sex**

The fact that alleged harassment arises from a failed intimate relationship does not, standing alone, remove it from Title VII's reach. *Forrest*, 511 F.3d at 229–30. In *Forrest*, the defendant argued that the alleged harassment resulted from "personal animosity stemming from [the parties'] failed relationship," rather than the plaintiff's sex. *Id.* at 229. The First Circuit rejected that reasoning as establishing a "false dichotomy," explaining that a victim's sex may be "inextricably linked to the harasser's decision to harass." *Id.* The Court of Appeals cautioned, however, that "[w]hether a harasser picks his or her targets because of a prior intimate relationship, desire for a future intimate relationship, or any other factor that draws the harasser's attention should not be the focus of the Title VII analysis." *Id.* Instead, the inquiry is whether "the harassing conduct is gender-based." *Id.*

Applying that principle, the *Forrest* court concluded that a reasonable jury could find sex-based harassment because the former partner repeatedly directed "sexually degrading, gender-specific epithets," including "slut," "whore," and "bitch," at the plaintiff. *Id.* at 229–230. Other First Circuit cases similarly identify facts connecting the challenged conduct to sex. *See, e.g., Wadsworth v. Nguyen*, 129 F.4th 38, 55–56 (1st Cir. 2025) ("Wadsworth has presented a plethora of evidence from which a jury could find that Principal Cavanaugh sexually harassed her," including that he "asked for pictures of her in a swimsuit and whether she had taken nude pictures of herself," "asked her about her sex life," and "used sexually charged, 'gender-specific epithets'"); *Rosario v. Dep't of Army*, 607 F.3d 241, 248-49 (1st Cir. 2010) (explaining that the record contained evidence that the harasser "complained about Rosario's appearance on a daily basis, regularly drew the attention of her co-workers to her body and undergarments," and "described her as a street woman to other employees"). Although harassing conduct "need not be overtly sexual in nature," the circumstances must still support an inference that the conduct occurred "because of . . . sex." *Id.* at 247-248.

*Crowley* is particularly relevant because it involved stalking and monitoring. There, a male coworker repeatedly appeared in the female plaintiff's work area, "followed Crowley at work," "often parked next to her car," "followed her to her car," and "frequently blocked her in the aisles." *See Crowley*, 303 F.3d at 398. But in *Crowley*, the stalking was part of a broader pattern that included conduct expressly connected to the plaintiff's gender. The First Circuit recounted that the male

coworker "grabbed her foot and massaged it against her will," told her "that she was the 'perfect woman' and that she had 'perfect women's feet,'" gave her "gifts intended to let her know that he was watching her both at and outside of work," and later "again stated that Crowley was the perfect woman." *Id.* at 398. *Crowley* therefore does not treat stalking, standing alone, as harassment based on sex; rather, the appeals court considered the stalking together with evidence that the conduct was "motivated by gender." *Id.* at 405.

Here, the First Amended Complaint contains no comparable allegations connecting Mr. Poland's conduct to Ms. Poland's sex. Ms. Poland alleges that Mr. Poland began harassing and stalking her after she told him she was divorcing him. *First Am. Compl.* ¶ 20. She alleges that he became jealous, threatened to damage her friends' car, disabled her cell-phone service and deflated her tire to prevent her from leaving, tracked her through her cell phone, placed tracking devices in her truck "to assert power and control over her," and sent her threatening messages. *Id.* ¶¶ 22–28. She further alleges that Mr. Poland "had been physically aggressive toward [her] in the recent past," had "recently threatened to take an axe to her friends' car" and "tried to prevent [her] from leaving the house," and, during the September 29 confrontation, "was screaming at her and kept moving aggressively towards her." *First Am. Compl.* ¶¶ 51, 53-54.

Ms. Poland's allegations describe troubling and abusive conduct, but they do not themselves connect that conduct to Ms. Poland's sex. Unlike the plaintiffs in *Forrest*, *Wadsworth*, *Rosario*, and *Crowley*, Ms. Poland does not allege sexual

advances, sexual touching, gender-specific epithets, comments about her sex or appearance, hostility toward women generally, or similar treatment of other women. Nor does she allege that Mr. Poland's threats, stalking, or surveillance contained an expressly sexual or gendered component. The allegations therefore do not provide grounds to infer that Mr. Poland acted in this manner because Ms. Poland is a woman.

Ms. Poland alleges that Mr. Poland "was angered and upset that Ms. Poland wanted to end her relationship with him" and was "motivated to retaliate against her for ending the relationship and having relationships with people other than him." *First Am. Compl.* ¶ 149. That allegation supplies a plausible explanation for why Mr. Poland allegedly targeted Ms. Poland. *Id.*

However, as discussed, *Forrest* draws a distinction between the circumstances explaining why the harasser selected the plaintiff and whether the resulting harassing conduct was gender-based. 511 F.3d at 229. The former does not establish the latter. The allegation that Mr. Poland targeted Ms. Poland because she sought to divorce him and began seeing another man plausibly supports an inference of jealousy, possessiveness, or personal animosity stemming from the dissolution of their marriage. Without additional factual allegations tying those motivations or the resulting conduct to gender, however, it does not plausibly establish that Mr. Poland harassed Ms. Poland because she is a woman as opposed to tensions common to many divorces, regardless of the gender of the harasser and victim. To conclude otherwise would effectively make harassment arising from jealousy or possessiveness following

the dissolution of an intimate relationship actionable because of the sex of the participants—the very shortcut *Forrest* instructs courts to avoid by focusing instead on whether the "harassing conduct is gender-based." *Id.*

Thus, even accepting the well-pleaded allegations as true, the First Amended Complaint does not plausibly allege that Mr. Poland engaged in the challenged conduct because of Ms. Poland's sex. The Court therefore grants UPS's motion to dismiss Counts Two and Seven.

### C. Counts One and Six: Ms. Poland's Sex Discrimination Claims

Ms. Poland alleges sex discrimination under the MHRA, Count One, and Title VII, Count Six. *Am. Compl.* ¶¶ 167, 177. Because Maine courts apply the same legal standards to parallel sex-discrimination claims under the MHRA and Title VII, the Court considers the claims together. *See Morrison v. Carleton Woolen Mills, Inc.*, 108 F.3d 429, 436 n.3 (1st Cir. 1997).

To establish a prima facie case of disparate treatment based on sex, a plaintiff must show that (1) she is a member of a protected class; (2) she was qualified for her position and performing her job at an acceptable level; (3) she suffered an adverse employment action; and (4) the circumstances surrounding that action support an inference that it was because of her membership in that protected class. *See Bhatti v. Trs. of Bos. Univ.*, 659 F.3d 64, 70 (1st Cir. 2011). At the pleading stage, "[i]t is not necessary to plead facts sufficient to establish a prima facie case," because "[t]he prima facie standard is an evidentiary standard, not a pleading standard." *Rodríguez-Reyes v. Molina-Rodríguez*, 711 F.3d 49, 54 (1st Cir. 2013). Instead, "the elements of a prima facie case may be used as a prism to shed light upon the

plausibility of the claim". *Rodríguez-Reyes*, 711 F.3d at 54. The Court concludes that the First Amended Complaint does not plausibly allege that UPS subjected Ms. Poland to an adverse employment action because of her sex.

Here, the parties do not dispute that Ms. Poland is a member of a protected class, was qualified for her position, and suffered an adverse employment action when UPS terminated her. The dispute centers on whether the circumstances surrounding her termination plausibly support an inference that UPS acted because of her sex. *Def.'s Mot.* at 11; *Pl.'s Opp'n* at 7; *Def.'s Reply* at 3–4.

Ms. Poland argues that she "was treated differently and worse than a male comparator, Mr. Poland," because UPS fired her for slapping him in self-defense while "he was not even disciplined for engaging in criminal domestic violence stalking and harassment" against her; she further asserts that both held the same position as UPS drivers. *Pl.'s Opp'n* at 9. Comparator evidence may support an inference of discrimination. A plaintiff may attempt to show that "others similarly situated to him in all relevant respects were treated differently by the employer." *Ray v. Ropes & Gray LLP*, 799 F.3d 99, 114 (1st Cir. 2015) (quoting *Kosereis v. Rhode Island*, 331 F.3d 207, 214 (1st Cir. 2003)). "Reasonableness is the touchstone" when considering comparators; "the plaintiff's case and the comparison cases that he advances need not be perfect replicas, [but] they must closely resemble one another in respect to relevant facts and circumstances." *Id.* (quoting *Conward v. Cambridge Sch. Comm.*, 171 F.3d 12, 20 (1st Cir. 1999)). The inquiry is whether "a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly

situated." *Id.* (quoting *Dartmouth Review v. Dartmouth Coll.*, 889 F.2d 13, 19 (1st Cir. 1989)); *see also Ripoli*, 123 F.4th at 580 ("similarity, rather than identicality," governs the inquiry).

In *Ripoli*, the First Circuit noted that the plaintiff and her proposed comparator both "served on the OVA's executive team," that their "job responsibilities did, in fact, overlap," and that the plaintiff "was not given the opportunity to be considered" for the new position ultimately filled by the male comparator. *Ripoli*, 123 F.4th at 578-79. By contrast, *Ray* rejected proposed comparators where there were "differentiating or mitigating circumstances" material to the employer's decision. *Ray*, 799 F.3d at 114-15 (noting that the plaintiff's evaluations contained "repeated refrains that he had insulted his co-workers, demeaned junior associates he worked with, and passed off work to others," which were "distinctively more extreme, and more numerous, than those contained in the evaluations of any of the comparators he offered").

Here, even though both parties held the same role as UPS drivers, the relevant difference is substantial.[5] UPS terminated Ms. Poland after she admitted striking a coworker on UPS property. The First Amended Complaint does not allege that Mr. Poland—or another male employee—struck a coworker at work and received more favorable discipline. *See Def.'s Reply* at 5. Mr. Poland's alleged stalking and

[5] The First Amended Complaint does not expressly allege that Mr. Poland was a UPS driver, although it alleges that Ms. Poland was a driver and that both Ms. Poland and Mr. Poland worked for UPS. *Am. Compl.* ¶¶ 13, 18. In her opposition, however, Ms. Poland characterizes the First Amended Complaint as alleging that she and Mr. Poland "were in the same position, namely UPS driver." *Pl.'s Opp'n* at 9. Drawing all reasonable inferences in Ms. Poland's favor at this stage, the Court will infer that Mr. Poland, like Ms. Poland, worked as a UPS driver.

threatening behavior was different conduct occurring under materially different circumstances.[6] Thus, unlike *Ripoli*, where the comparator evidence concerned substantially overlapping positions affected by the same employment decision, the Polands were not subjected to discipline for roughly equivalent misconduct. Therefore, the fact that UPS allegedly did not discipline Mr. Poland for different misconduct does not, without more, plausibly suggest that UPS terminated Ms. Poland because she is a woman.

Ms. Poland also argues that UPS's response to her complaints reflects a gender-based double standard, characterizing UPS as blaming her for the "drama" surrounding the Polands' dispute while disregarding Mr. Poland's conduct. *Pl.'s Opp'n* at 7–9. The pleaded facts provide some support for her characterization of UPS's response as dismissive: Ms. Lyons allegedly was "short with Ms. Poland" and "sternly said, 'No one has told Mr. Poland where you were, none of us want to be involved in that situation'"; Mr. Simpson allegedly "did not seem concerned at all about the situation with Mr. Poland"; and, during the November 2 investigation, Ms. Poland "was asked many questions about slapping Mr. Poland" but "only a handful of questions" about her complaint that he "harassed and stalked her at work." *First Am. Compl.* ¶¶ 88, 93, 123-24. Ms. Poland further alleges that she "showed Ms. Gloddy the PFA and the police report," but Ms. Gloddy "said she did not want to see the police report." *Id.* ¶¶ 128-29. But the First Amended Complaint does not allege

[6] The Court does not suggest that stalking is less or more serious than striking a coworker, or otherwise attempt to rank the relative severity of the alleged conduct. The point is narrower: the conduct is different in kind, and the comparator inquiry asks whether the employees were "similarly situated in respects relevant to the employer's disciplinary decision." *Ray*, 799 F.3d at 114.

that any UPS employee actually characterized the dispute as "drama," made a gender-specific remark, or otherwise indicated that UPS discounted Ms. Poland's complaints because she was a woman.

Finally, Ms. Poland seeks to attribute Mr. Poland's alleged discriminatory bias to UPS under *Velázquez-Pérez v. Developers Diversified Realty Corp.*, 753 F.3d 265, 274 (1st Cir. 2014). *Am. Compl.* ¶¶ 153–58. Under *Velázquez-Pérez*, an employer may be liable where "the plaintiff's co-worker makes statements maligning the plaintiff, for discriminatory reasons and with the intent to cause the plaintiff's firing; the co-worker's discriminatory acts proximately cause the plaintiff to be fired; and the employer acts negligently by allowing the co-worker's acts to achieve their desired effect though it knows (or reasonably should know) of the discriminatory motivation." *Velázquez-Pérez*, 753 F.3d at 274. UPS argues that this theory fails because Mr. Poland "was not motivated by Plaintiff's gender," but instead by his "contempt for [Plaintiff] following their failed relationship," such that "[Plaintiff's] gender was merely coincidental." *Def.'s Mot.* at 11 n.9. UPS further contends that "there is no reasonable inference to suggest that UPS was negligent in discovering Mr. Poland's animus" because "a UPS investigator interviewed Plaintiff about Mr. Poland's conduct" and she "therefore had an opportunity to correct any omissions in Mr. Poland's complaint." *Id.* The Court agrees with UPS on the first point.

As discussed above, the First Amended Complaint does not plausibly allege that Mr. Poland's conduct toward Ms. Poland was motivated by her sex. *See supra* Section III.B.1. The same deficiency defeats Ms. Poland's reliance on *Velázquez-*

*Pérez*: because that theory requires the coworker to have acted "for discriminatory reasons," *Velázquez-Pérez*, 753 F.3d at 274, Mr. Poland's alleged personal animus cannot supply the discriminatory motivation necessary to attribute his conduct to UPS for purposes of Ms. Poland's sex-discrimination claims. The Court therefore need not decide whether the First Amended Complaint plausibly alleges that UPS was negligent in allowing Mr. Poland's conduct to cause her termination.

Accordingly, drawing all reasonable inferences in Ms. Poland's favor, the First Amended Complaint does not plausibly allege that UPS terminated or otherwise treated Ms. Poland differently because of her sex. The Court therefore grants UPS's motion to dismiss Counts One and Six.

### D. Count Three: PFA Discrimination

Section 4572(1)(A) of the MHRA expressly prohibits an employer, "because" an applicant "sought and received an order of protection," from "discharg[ing] an employee or discriminat[ing] with respect to . . . terms, conditions or privileges of employment or any other matter directly or indirectly related to employment." 5 M.R.S. § 4572(1)(A). Neither party identifies, and the Court has not located, a Maine decision applying this provision to an employee who claims she was terminated because she obtained a protection order. The Court therefore looks to the language of the statute and analyzes whether the First Amended Complaint plausibly alleges UPS terminated Ms. Poland because she received a PFA.

The Court concludes that these allegations are sufficient, at the pleading stage, to support a reasonable inference of causation. Ms. Poland argues that the timing is probative because UPS "was aware of Plaintiff's slap for over a month yet took no

action until Plaintiff engaged in three protected reports, including one on the day before she was fired." *Pl.'s Opp'n* at 14. In *Calero-Cerezo v. U.S. Department of Justice*, the First Circuit explained that, where a plaintiff relies on "mere temporal proximity" to establish causation, the temporal proximity must be "very close." 355 F.3d 6, 25 (1st Cir. 2004) (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001)). The court further observed that "a showing of discharge soon after the employee engages in an activity specifically protected by . . . Title VII . . . is indirect proof of a causal connection between the firing and the activity because it is strongly suggestive of retaliation." *Id.* (quoting *Oliver v. Digit. Equip. Corp.*, 846 F.2d 103, 110 (1st Cir. 1988)). Applying that standard, the First Circuit concluded that a proposed suspension occurring "roughly a month" after the employer learned of the plaintiff's EEO complaint was sufficiently close to satisfy the causation element of her prima facie retaliation case. *Id.* at 26. That approximately one-month period is comparable to the interval alleged here.

Ms. Poland's allegations do not rest on temporal proximity alone. She alleges that on September 30 she showed Mr. Simpson the PFA, *First Am. Compl.* ¶ 72, told him that the police had concluded she acted in self-defense when she slapped Mr. Poland, *id.*, and was told only to make sure "nothing like that happens again on UPS property." *Id.* ¶ 75. She alleges that she heard nothing more about the incident "for over one month." *Id.* ¶ 77. During that period, Mr. Poland allegedly continued to stalk her while she was working, *id.* ¶¶ 79, 83–91, and was arrested for violating the PFA. *Id.* ¶ 110. UPS then terminated Ms. Poland on November 2 for "workplace

violence because she admitted to slapping Mr. Poland on September 29, 2023." *Id.* ¶ 136.

*Harding v. Cianbro Corp.*, 498 F. Supp. 2d 344 (D. Me. 2007), although involving disability discrimination, illustrates why the broader sequence matters. There, the Court recognized that "'chronological proximity will not by itself establish causality where the larger picture undercuts any claim of causation.'" *Id.* at 349 (quoting *Eaton v. Kindred Nursing Ctrs. W., LLC*, No. 04-131-B-W, 2005 U.S. Dist. LEXIS 9545, at *21 (D. Me. May 19, 2005)). The Court nevertheless concluded that the circumstances supported an inference of discrimination because Cianbro had employed the plaintiff "for over eighteen years" before firing him "approximately five weeks" after learning of his disability. *Id.* at 350. As the Court explained, the plaintiff's "long-term employment makes it less likely that its decision to terminate within weeks of the revelation of his fibromyalgia is purely coincidental to that recent revelation." *Id.* The point was therefore not simply that five weeks was temporally close, but that the employer's prior course of conduct made its decision to act only after learning of the protected characteristic more probative of causation. As in *Harding*, Ms. Poland's employment history provides additional context: she had worked for UPS for approximately three years in total before UPS terminated her following the alleged protected activity. *See Compl.* ¶¶ 12-13.

UPS has a substantial response. It argues that Mr. Poland's October 24 formal complaint was an intervening event that triggered a separate investigative process and that Ms. Poland does not allege that the supervisors who initially learned of the

September 29 incident ultimately made the termination decision. *Def.'s Mot.* at 13–14. Relying on *Robinson v. Town of Marshfield*, 950 F.3d 21 (1st Cir. 2020), UPS argues that there are "no facts to suggest that [Ms. Poland] was terminated for [showing her manager the PFA], and not because Mr. Poland reported her to the HR hotline a month later." *Def.'s Reply* at 5. UPS relies on *Robinson*, where the First Circuit concluded that temporal proximity did not support causation because an intervening investigation provided an alternative explanation for the adverse action. *Def.'s Reply* at 5 (citing *Robinson*, 950 F.3d at 31). In *Robinson*, the "[t]own had hired the law firm to conduct its investigation . . . before [Robinson] had filed his January 2015 complaint," and Robinson pointed to no evidence that the law firm "knew about his January 2015 complaint" while conducting the investigation or preparing its report. 950 F.3d at 30–31. The law firm then issued its report substantiating the alleged misconduct "immediately before the Town took the alleged adverse actions." *Id.* at 30. "[T]hus, given the intervening event of the report's issuance," the First Circuit rejected Robinson's attempt to establish pretext "based on timing alone." *Id.* at 31.

Although Mr. Poland's formal complaint provides an alternative explanation for why UPS revisited the September 29 incident, the pleadings do not establish that the ensuing investigation was independent of UPS's knowledge of the PFA and subsequent PFA-related events as in *Robinson*. Nor can the Court determine at this stage whether Ms. Poland's reports reached, the ultimate decisionmakers.

Accordingly, UPS's alternative explanation weakens the inference of causation but does not foreclose it at the pleading stage.

At this stage, the alleged sequence of events plausibly supports an inference that her seeking and receiving the PFA contributed to UPS's termination decision. The Court therefore denies UPS's motion to dismiss Count Three.

### E. Counts Four and Eight: Retaliation Under the MHRA and Title VII

Title VII prohibits an employer from discriminating against an employee because she "has opposed any practice made an unlawful employment practice" by Title VII. 42 U.S.C. § 2000e-3(a). The MHRA similarly prohibits discrimination against an employee because she "has opposed any act or practice that is unlawful under" the MHRA. 5 M.R.S. § 4633(1). The Court analyzes the Title VII and MHRA retaliation claims under the same framework. *See Roy v. Correct Care Sols., LLC*, 914 F.3d 52, 68 n.9 (1st Cir. 2019) ("Federal law guides interpretation of the MHRA . . . and we consider the MHRA to be parallel with Title VII here"). To establish a retaliation claim, a plaintiff must show that "(1) she engaged in protected conduct; (2) she experienced an adverse employment action; and (3) there was a causal connection between the protected conduct and the adverse employment action." *Calero-Cerezo*, 355 F.3d at 25; *See also Theriault v. Genesis HealthCare LLC*, 890 F.3d 342, 349 (1st Cir. 2018).

There is no dispute that Ms. Poland's termination constitutes an adverse employment action. UPS disputes whether Ms. Poland's protected activity caused her termination. The Court concludes, however, that the allegations concerning the

timing and circumstances of Ms. Poland's termination are sufficient at the pleading stage to support a reasonable inference of causation. *See supra* Section III.D. The remaining question, therefore, is whether Ms. Poland plausibly alleges that she engaged in activity protected by Title VII and the MHRA.

The Court has concluded that the First Amended Complaint does not plausibly allege that Mr. Poland's conduct constituted harassment because of sex. *See supra* Section II.B.1. The inquiry is different though, for purposes of Ms. Poland's retaliation claims. To establish protected activity, a plaintiff "need not prove that the conditions against which [s]he protested actually amounted to a violation of Title VII." *Fantini*, 557 F.3d at 32 (quoting *Wimmer v. Suffolk Cnty. Police Dep't*, 176 F.3d 125, 134 (2d Cir. 1999)). Rather, she "must demonstrate only that [s]he had a 'good faith, reasonable belief that the underlying challenged actions of the employer violated the law.'" *Id.* (quoting *Wimmer*, 176 F.3d at 134).[7] Furthermore, the failure of an underlying discrimination claim does not necessarily foreclose a related retaliation claim. A plaintiff claiming retaliation "need not prove that the conditions against which [s]he protested actually amounted to a violation of Title VII." *Kinzer v. Whole Foods Mkt., Inc.*, 99 F.4th 105, 115 (1st Cir. 2024) (quoting *Fantini*, 557 F.3d at 32). Accordingly, the Court's conclusion that Ms. Poland has not plausibly alleged

---

[7] UPS relies on *Santiago v. Lloyd*, 66 F. Supp. 2d 282, 285–86 (D.P.R. 1999). *See Def.'s Mot.* at 15. *Santiago* describes the reasonable-belief inquiry as containing distinct "subjective and objective components." *Id* at 285. Although *Santiago* derived that formulation from Eleventh Circuit precedent, the First Circuit has similarly distinguished good faith from reasonableness. *See Ray*, 799 F.3d at 111. As *Ray* explained, "when assessing a plaintiff's good faith, a factfinder need only ask whether a plaintiff had a subjective, honestly held belief that her claim was valid." *Id.* The district court further observed that it had "previously distinguished between a 'good faith' belief and a 'reasonable belief' in the context of Title VII's anti-retaliation provisions." *Id.*

that the conduct she reported constituted sex discrimination does not, standing alone, resolve whether her reports constituted protected activity.

The First Amended Complaint alleges not merely that Ms. Poland experienced and reported stalking and harassment, but that she made those reports to address what she believed was "harassment of her based on sex." *First Am. Compl.* ¶ 78. At this stage, the Court must accept that allegation as true and draw all reasonable inferences in Ms. Poland's favor. *See Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 12 (1st Cir. 2011) ("[T]he court must draw all reasonable inferences in favor of the plaintiff."). Doing so, the Court can reasonably infer that, when Ms. Poland made the reports, she subjectively believed the conduct she was reporting constituted sex-based harassment.

The fact that the conduct Ms. Poland reported was not itself sexual does not render her belief that it was based on sex unreasonable. *See Pérez-Cordero v. Wal-Mart P.R., Inc.*, 656 F.3d 19, 31–32 (1st Cir. 2011) ("Although the conduct [the employee] complained of—a public scolding—was not itself sexual, it nevertheless constituted sexual harassment," because it "was part of [the supervisor's] reprisal" for her "failed, public attempt to establish a romantic relationship with him"); *Cf. Hernández v. Wilkinson*, 986 F.3d 98, 102-103 (1st Cir. 2021) (concluding that the employee "could not have had a good faith, reasonable belief" that an altercation violated Title VII where she "admit[ted] that the altercation . . . was an isolated incident that was purely work related" and "was informed that such isolated, work-related disputes do not create a hostile work environment under Title VII").

Although the allegations do not plausibly establish that Mr. Poland's conduct was in fact because of Ms. Poland's sex, they are sufficient at this stage to plausibly allege that Ms. Poland reasonably and in good faith believed that the conduct she opposed constituted unlawful sex-based harassment. Whether the evidence ultimately supports that belief is a question for a developed record. Accordingly, the Court denies UPS's motion to dismiss Counts Four and Eight.

**F. Count Five: Retaliation under the Maine Whistleblowers' Protection Act (MWPA)**

Section 833(1)(A) protects an employee who, "acting in good faith," reports to her employer "what the employee has reasonable cause to believe is a violation of a law or rule." 26 M.R.S. § 833(1)(A).[8] To prevail on an MWPA claim, the plaintiff must demonstrate that "(1) she engaged in activity protected by the WPA; (2) she experienced an adverse employment action; and (3) a causal connection existed between the protected activity and the adverse employment action." *Walsh v. Town of Millinocket*, 2011 ME 99, ¶ 24, 28 A.3d 610, 616. Maine law "provides a private

[8] Count Five of the First Amended Complaint asserts retaliation under the MWPA but does not identify the statutory provision under which Ms. Poland claims her reports constituted protected activity. *First Am. Compl.* ¶¶ 174-75. UPS's motion to dismiss likewise does not identify or analyze a particular provision of the MWPA. *See Def.'s Mot.* at 12. In her opposition, Ms. Poland for the first time identifies a specific statutory basis for her claim, asserting in a footnote that her reports were protected because they concerned conduct she reasonably believed violated the law. *Pl.'s Opp'n* at 11-12 n.4. She cites section 831(1)(A), a subsection that does not exist, but describes section 833(1)(A). *Id.* The Court assumes this is a scrivener's error and that Ms. Poland intended to invoke section 833(1)(A). UPS does not address § 833(1)(A) in its reply. The failure to identify section 833(1)(A) in the First Amended Complaint does not itself require dismissal. *See Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014) (per curiam) ("Federal pleading rules . . . do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted"). The First Amended Complaint must, however, "plead facts sufficient to show that [the] claim has substantive plausibility." *Id.* at 12. The Court therefore considers whether the facts alleged in the First Amended Complaint plausibly state a claim for retaliation based on protected activity under section 833(1)(A).

right of action for a violation of the [M]WPA." *Murray v. Kindred Nursing Ctrs. W., LLC*, 789 F.3d 20, 25 (1st Cir. 2015).

UPS does not dispute that Ms. Poland's termination constitutes an adverse employment action, and the Court concludes that Ms. Poland has plausibly alleged a causal connection between her reports and her termination. *See supra* Section II.A.4; *see also Murray*, 789 F.3d at 26 ("[C]lose temporal proximity between the protected activity and the adverse employment action is a sufficient showing of causation for purposes of the prima facie case."). The Court considers whether Ms. Poland has plausibly alleged that she engaged in activity protected by the MWPA.

Under section 833(1)(A), protected activity includes a good-faith report to an employer of conduct that the employee has "reasonable cause to believe is a violation of a law or rule." 26 M.R.S. § 833(1)(A). The "reasonable cause requirement" requires that the employee's belief be "objectively reasonable." *Galouch v. Dep't of Pro. & Fin. Regul.*, 2015 ME 44, ¶ 14, 114 A.3d 988, 993. Thus, although the MWPA "does not require an employee be able to cite to a particular statute or rule that may have been violated," the employee's "subjective belief alone is insufficient." *Id.* ¶ 15, 114 A.3d at 993. *See also Handlin v. Broadreach Pub. Rels., LLC*, 2022 ME 2, ¶ 11, 265 A.3d 1008, 1012 ("The [M]WPA protects an employee against retaliation for making a good faith report to the employer of what the employee has reasonable cause to believe is a violation of a law" (quoting *Nadeau,* 2021 ME 16, ¶ 26, 247 A.3d 717).

Ms. Poland alleges that, while the PFA was in effect, Mr. Poland appeared on her delivery route and that she believed he had used UPS's systems to locate and

follow her. *First Am. Compl.* ¶¶ 79, 81-85. She reported what had happened to Ms. Lyons and then reported the "stalking" to Mr. Simpson. *Id.* ¶¶ 86-91. She later reported to UPS Human Resources that Mr. Poland had "harassed and stalked her at the UPS facility while she was driving for UPS." *Id.* ¶ 119. She further alleges that Mr. Poland was arrested on October 18, 2023, "for stalking Ms. Poland and violating the PFA order," *id.* ¶ 110, and that she later showed UPS's investigator the PFA and told her that a police report documented Mr. Poland's admission that he had placed trackers on her vehicle and stalked her. *Id.* ¶¶ 127-29. Taken as true, these allegations plausibly support the inference that Ms. Poland made good-faith reports of conduct she had reasonable cause to believe violated the law.

Unlike in *Galouch*, where the employee reported that a court reporter "was in breach of her contract with the Department," and the Law Court concluded that, even assuming the breach, "a reasonable person could not consider that conduct to be a violation of the law," *Galouch*, 2015 ME 44, ¶ 16, 114 A.3d at 994, Ms. Poland alleges that she reported conduct she understood to constitute stalking and a violation of a court-issued protection order. The Court therefore concludes that Ms. Poland has plausibly alleged protected activity under section 833(1)(A) and denies UPS's motion to dismiss Count Five.

## IV. CONCLUSION

The Court GRANTS in part and DENIES in part Defendant's Motion to Dismiss (ECF No. 9). The Court DISMISSES Counts One, Two, Six, and Seven, and DENIES the motion as to Counts Three, Four, Five, and Eight.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 21st day of September, 2026